## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALICIA M. PAGE, individually, and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>vs.<br><br>ALLIANT CREDIT UNION, and DOES 1-100,<br><br>      Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff, Alicia M. Page ("Plaintiff"), by her attorneys, hereby brings this class action against Defendants, Alliant Credit Union and DOES 1 through 100 (collectively "ACU" or "Defendants").

## NATURE OF THE CLASS ACTION

1.      All allegations herein are based upon information and belief, except those allegations which pertain to Plaintiff or her counsel. Allegations pertaining to Plaintiff or her counsel are based upon, inter alia, Plaintiff or her counsel's personal knowledge, as well as Plaintiff or her counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      This is a class action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all other persons similarly situated, and in her capacity as a private attorney general on behalf of the members of the general public. As alleged herein, ACU wrongfully charged Plaintiff and  Class members overdraft and NSF (non-sufficient funds) fees.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to

ACU's policy and practice of assessing an overdraft or NSF fee on transactions when there was enough money in the account holder's checking account to cover (pay for) the transactions presented for payment. The charging for such overdraft/NSF fees breaches ACU's contract with its customers, who include Plaintiff and the members of the Class.

4.      The charging for such overdraft/NSF fees also violates federal law. ACU failed to describe its actual overdraft service in its Opt-In Contract (because the language in its Opt-In Contract fails to describe the actual method by which ACU calculates its overdraft fees, instead describing a method under which overdrafts only result when there is not enough money in the account to pay for a transaction). Alternatively, ACU did not obtain opt-ins from its customers whatsoever. Thus, Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C. §§ 1693 *et seq.*) prohibited ACU from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)), but ACU did so anyway.

## PARTIES

5.      Plaintiff is a resident of Hoboken, New Jersey, and was a member of ACU at all times relevant to this class action.

6.      Based on information and belief, Defendant ACU is and has been an Illinois state-chartered credit union with branch offices located throughout New Jersey. ACU is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

7.      Without limitation, Defendants Does 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of ACU and, upon information and belief, also own and/or operate ACU branch locations. Each of Defendants Does 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)). As used herein, where appropriate, the term "ACU" is also inclusive of Defendants Does 1 through 100.

8.      Plaintiff is unaware of the true names of Defendants Does 1 through 100. Defendants Does 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants Does 1 through 100 when the true

names are ascertained, or as permitted by law or by the Court.

9.    There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named Defendants (including Does) such that any corporate individuality and separateness between the named Defendants has ceased, and that the named Defendants are *alter egos* because the named Defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

10.    At all material times herein, each Defendant was the agent, servant, co-conspirator and/or employer of each of the remaining Defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining Defendants, and ratified and approved the acts of the other Defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

11.    Whenever reference is made in this Complaint to any act, deed, or conduct of a Defendant, the allegation means that the Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the Defendant's ordinary business and affairs.

12.    As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

13.    This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

14.    This Court has personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in the State of New Jersey.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred

in this District.

## FACTUAL ALLEGATIONS

**A.    ACU's Unlawful Charges of Overdraft Fees**

16.    ACU is a credit union with over 30 branches located in New Jersey and holding approximately $9.3 billion in assets.  ACU offers its consumer banking customers a checking account.  One of the features of an ACU checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of an ACU checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

17.    In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), ACU assesses overdraft and NSF fees to customer accounts when it determines that a customer's account has been overdrawn.

18.    Overdraft fees constitute the primary fee generators for banks and credit unions. In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.  While credit unions portray themselves to customers as more overdraft and fee-friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as ACU, overdraft fees are a major source of revenue and a profit center.  According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6% to 7% of the gross revenue of credit unions.  (Filene Research Institute Report, Overdraft Regulation A Silver Lining In The Clouds?  Filene Research Institute 2010).

19.    The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of the customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices," at p. 4).  More than 60% of the transactions that resulted in a

large overdraft fee were for less than $50. (June 2014 Pew Charitable Trust report entitled "Overdrawn," at p. 8). More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id.* at p. 5), and more than two-thirds of customers would have preferred that the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id.* at p. 10).

20.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees. (*Id.* at p. 1). A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. (*Id.* at p. 3). More than 50% of the customers assessed overdraft fees earned under $40,000 per year. (*Id.* at p. 4). Non-whites are 83% more likely to pay an overdraft fee than whites. (*Id.* at p. 3).

21.    As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees utilizing methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

22.    The U.S. Government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

23.    To qualify as affirmative consent, the Opt-In Contract must include, but is not limited to the following:

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_ Rulemaking.pdf, at p. 74-75.

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that can be assessed on any given day;

- The financial institution must state whether alternatives, such as linking the checking account to a secondary account or line of credit, are available.

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box; and

- The financial institution may not provide different terms for the account depending on whether the customer opted in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.

24.    At all relevant times, ACU has had an overdraft program in place for assessing overdraft/NSF fees which is (a) contrary to the express terms of its contract with members; (b) contrary to ACU's representations about its overdraft program to its members; and (c) contrary to its members' expectations regarding the assessment of overdraft fees.

25.    Under ACU's contracts with its members, ACU has promised that it will only assess an overdraft/NSF fee against an account when ACU pays a transaction that results in a negative balance for that account.

26.    ACU entered into two written contracts with Plaintiff and its other customers regarding overdraft fees. On information and belief, ACU entered into the first contract with Plaintiff and its other customers when they agreed to enter ACU's overdraft program. On information and belief it is entitled "What You Need To Know About Overdrafts And Overdraft

Fees" and is referred to herein as the "Opt-In Contract." ACU was required by Regulation E to provide this contract, which governs the terms under which ACU may assess Plaintiff and the Class members overdraft fees for ATM and non-recurring debit card transactions, to Plaintiff and the Class members, and it provides them with the means to accept those terms. In the Opt-In Contract, ACU promised that: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." This promise means that ACU is not authorized to assess an overdraft fee—because an overdraft has not occurred—unless there is not enough money in the customer's account to cover the transaction. It does not in any way state that there will be deductions made from the money in the customer's account arising from holds placed on pending debit card transactions to create a different artificial balance other than the money in the account on which overdraft fees would be assessed; nor does it state that holds placed on funds in the account arising from deposit holds would reduce the amount of money in the account for the purposes of determining when an overdraft has occurred and an overdraft fee will be assessed. Because the Opt-In Contract does not describe ACU's actual overdraft service, the Opt-In Contract also fails to comply with the requirements of Regulation E. The Opt-In Contract nonetheless contains promises to which ACU is contractually bound.

27.    However, directly contrary to these promises in the Account Agreement and Opt-In Contract, ACU's policy and practice is to ignore whether there is money in the account or a negative balance. Instead, ACU's policy and practice is, and at all times relevant herein has been, to assess overdraft fees based on an artificial internal calculation by which it deducts holds it has placed on either pending debit card transactions or deposits, rather than use the actual money in the account as required by the Opt-In Contract, or the funds in the account as required by the Account Agreement, without deduction for pending debit card transactions to determine whether an overdraft has occurred.

28.    The artificial balance created by ACU which it used is not the customer's actual money in the account. Rather, it is the balance in a customer's account minus anticipated future debits (debits that may or may not occur) and minus deposit holds. Not only is the practice of

using this artificial balance method (rather than the money in the account) to determine whether a transaction results in an overdraft and, thus, is subject to an overdraft fee directly contrary to ACU's Account Agreement and Opt-In Contract, but such practices have resulted in ACU improperly charging unlawful overdraft fees. ACU created this "artificial balance" to increase overdraft fees it charged to its customers.

29.    ACU's practice of charging overdraft fees, even when there is enough money in the account to cover a transaction presented for payment, is inconsistent with how ACU expressly describes the circumstances under which overdraft fees are assessed. Further, ACU has charged its customers, including Plaintiff and the members of the Class, overdraft fees for ATM and/or non-recurring debit card purchases, without obtaining their appropriate consent to do so, in violation of Regulation E, and in violation of its contractual promises that it would not charge overdraft fees for ATM and non-recurring debit card purchases without obtaining its customers' separate consent, because ACU's opt-in method or methods do not include providing its customers the information required to obtain their legally binding informed consent because, *inter alia*, the description in the Opt-In Contract did not describe what ACU was actually doing, as required by Regulation E.

30.    The importance of Regulation E is highlighted by the fact that the Bureau's study of actual practices found that (a) ATM and debit card transactions are by far the most frequent transactions that occur; (b) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and (c) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[2]

31.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

32.    Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the Class Period. The money in the account,

---

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

without deductions for holds on pending transactions or on deposits, as stated, is the official balance of the account. It is the balance provided to the customer in monthly statements, which is the official record of activity in the account. It is the balance used to determine interest on deposits and any minimum balance requirements.

33.    Further, based on information and belief, it is the balance used by ACU to report its deposits to regulators, shareholders, and the public. It is the deposit balance provided to regulators in call reports and reserve reports. It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of ACU.

34.    When ACU refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the balance without deduction for pending debit card transactions or deduction for holds on deposits. In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the balance in the account rather than an artificially created balance which has deducted pending transactions, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive." The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." (Supervisory Highlights, Winter 2015, at p. 9.)

35.    ACU clearly could have, but did not, accurately described its overdraft program in its Opt-In Contract. Because it did not, it breached that agreement when it charged overdraft fees on a positive balance, and it violated Regulation E by charging any overdraft fees whatsoever on ATM and debit card transactions, given that it did not accurately describe its overdraft program in the required notice.

36.    Plaintiff and Class members entered into the second contract, titled "Account Agreement and Disclosures" (and referred to herein as the "Account Agreement") when they

opened their accounts. The Account Agreement contains a promise that ACU will not charge overdraft fees for any type of transaction where there is enough money in the account to pay for the transaction. It states that "[i]f an item is presented for payment and there are not sufficient funds in your account to pay it," ACU will next look to potential overdraft sources, such as a linked savings account, and that "[i]f the amount of the item presented for payment exceeds the total of all available overdraft sources, the item will be returned as non-sufficient funds (NSF) and you will be charged applicable fees." Thus an overdraft can <u>only</u> occur where there are "not sufficient funds" in the account; *i.e.*, when the account as a whole contains less money than has been called for. Nowhere in the Account Agreement is there any indication that in determining whether an overdraft occurs, ACU will consider anything less than the entire amount of money in the account; nowhere does the contract state that ACU will place holds on funds in the account and that these funds will not be counted in determining when an overdraft occurs. That is the very practice this class action confronts.

37.    The Account Agreement, at most, states in a separate section pertaining to deposits rather than to overdraft/NSF fees that temporary holds might be placed on certain deposited items before they can be withdrawn, but this section does not state that such holds will be considered in determining when overdraft/NSF fees occur; and indeed, nowhere is it stated in the Account Agreement that overdraft/NSF fees can result from holds placed on funds earmarked for pending transactions.

38.    Under the Account Agreement, although Plaintiff disputes it, the only funds which even *arguably* could not be considered as "available" for purposes of overdrafts/NSFs were those which were subject to temporary holds immediately upon deposit (even though this is not stated or disclosed in the section pertaining to overdrafts) but not funds on which holds were placed due to pending transactions. Although it is Plaintiff's position that during the Class Period ACU, under its contractual terms with Class members, could only charge an overdraft/NSF fee if the balance in the account became negative without regard to any deductions for holds on deposits, or any other holds, the absolute best case scenario for ACU is

that it was allowed under the Account Agreement in certain circumstances to place holds on recently deposited, *i.e.*, uncollected, funds in the account, and deduct those funds from the account balance in determining whether or not an overdraft has occurred, but that it was in any case not permitted to deduct from the account funds on which holds had been placed for transactions which had not yet gone through.

39.    ACU's contractual promises in the Account Agreement and the Opt-In Contract to assess overdraft/NSF fees only when there is not enough money in the account to cover the item was also repeated to customers in other disclosures and marketing materials.  ACU also promises in the Opt-In Contract, Account Agreement, and marketing materials that it will not assess overdraft/NSF fees on ATM and non-recurring debit card transactions against any customer who does not "opt-in" to the overdraft service.

40.    Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.

**B.    Unlawful Overdraft Fees Assessed to Plaintiff**

41.    Plaintiff was harmed by Defendant's policy and practice of charging overdraft fees when there was money in her account to cover the transaction.  Plaintiff entered into two agreements with ACU, wherein ACU contracted to charge overdraft fees only if her account did not have money to cover the transaction.  By nonetheless charging Plaintiff overdraft/NSF fees when her account did contain enough money to cover the transaction at issue, ACU breached its contracts with Plaintiff and violated Regulation E.  On information and belief, at least one such instance has occurred within twelve months of filing this Complaint.  It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee; however, Plaintiff has already uncovered many.  To give one example, on January 4, 2017, Ms. Page was charged a $25 fee labeled "NSF" for attempting to pay a bill in the amount of $6,000 when her account contained $6,670.94.  Plaintiff has a reasonable belief that a complete review of her records and ACU's records will show multiple instances in which ACU improperly charged Plaintiff overdraft fees for transactions despite the fact that she had enough money in her

account to cover the transactions.

42.    Moreover, the assessment and unilateral taking of improper overdraft fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which ACU assesses further overdraft/NSF fees.  This practice was deemed to be deceptive and substantially harmful to customers by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(Supervisory Highlights, Winter 2015, a pp. 8-9.)   A complete evaluation of ACU's records is necessary to determine the full extent of Plaintiff's harm from this practice.

43.    Additionally, because the Opt-In Contract did not describe ACU's actual overdraft service, ACU violated Regulation E by charging overdraft fees on ATM and non-recurring debit card transactions.  Because it failed to provide the full and accurate disclosures to Plaintiff required by Regulation E, ACU failed to obtain Plaintiff's fully informed consent, as required by Regulation E, in order for ACU to be authorized to charge such overdraft fees.  Because ACU was not legally authorized to enroll Plaintiff into the Courtesy Payment program for non-recurring debit card and ATM transactions, ACU violated Regulation E when it assessed

*any* overdraft fees against Plaintiff for non-recurring debit card and ATM transactions.

44.    Plaintiff was harmed by this practice when she was assessed overdraft fees for nonrecurring debit card and ATM transactions.  A complete evaluation of ACU's records is necessary to determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

45.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

46.    Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following class.

47.    The "Class" is composed of two classes:

**The Positive Balance Class:**

> **All United States residents who have or have had accounts with ACU who incurred an overdraft fee or overdraft fees when the balance in the checking account was sufficient to cover the transactions during the period beginning six years preceding the filing of this Complaint and ending on the date the Class is certified.**

**The Regulation E Class:**

> **All United States residents who have or have had accounts with ACU who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010, and ending on the date the Class is certified.**

48.    Excluded from the Class are: (a) any entity in which Defendant has a controlling interest; (b) officers or directors of Defendant; (c) this Court and any of its employees assigned to work on the case; and (d) all employees of the law firms representing Plaintiff and the Class members.

49.    This action has been brought and may be properly maintained on behalf of each

member of the Class under Federal Rule of Civil Procedure 23.

50.    **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that a joinder of all members would be impracticable. While the exact number of Class members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include thousands of members based on the fact that ACU has approximately $9.3 billion in assets and operates hundreds of branches nationwide.

51.    Upon information and belief, Defendants have databases and/or other documentation of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by experts to ascertain which of ACU's customers have been harmed by its practices and thus qualify as Class members.  Further, the above-referenced Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or e-mail, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications.

52.    **Commonality (Federal Rule of Civil Procedure 23(a)(2)** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and Class members include, but are not limited to, the following:

> a.    Whether, pursuant to the Opt-In Contract, Defendant promised to Plaintiff and Class members that it would not charge an overdraft/NSF fee if there was enough money in the account to cover the transaction;

> b.    Whether, pursuant to the Account Agreement, Defendant promised to Plaintiff and Class members that it would not charge an overdraft/NSF fee if there was enough money in the account to cover the transaction;

> c.    Whether Defendant breached the Opt-In Contract or Account Agreement by assessing overdraft/NSF fees for transactions when customers'

checking accounts contained enough money to cover the transactions;

d.      Whether the language in the Opt-In Contract— "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."—described Defendant's overdraft service pursuant to which Defendant assessed overdraft/NSF fees;

e.      Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment, money had and received, and violations of the New Jersey Consumer Fraud Act.; and

f.      Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

53.    **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – Plaintiff's claims are typical of all of the members of the Class. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Opt-In Contract and Account Agreement, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue, are uniform for Plaintiff and Class members. Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class members.

54.    **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts between the claims of the Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and her counsel intend to prosecute this action vigorously.

55.    **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members. Further, the class action is superior to

all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

56.    Plaintiff is not aware of any separate litigation instituted by any of the Class members against Defendant. Plaintiff does not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class members and that she will adequately represent the Class. This particular forum is a desirable forum for this litigation because both Plaintiff and Defendant reside in this District, where Defendant operates branch offices, and because the claims arose from activities which occurred primarily in this District. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

57.    Plaintiff anticipates the issuance of notice, setting forth the subject and nature of

the instant action, to the proposed Class members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

58.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

    a.  Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class action format, prosecution of separate actions by individual members of the Class will create the risk of:

        1.  Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

        2.  Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

    b.  Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

        1.  The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

        2.  The extent and nature of any litigation concerning controversy

already commenced by or against members of the Class;

3.  The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4.  The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION

### (Breach of the Opt-In Contract)

59.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

60.    Plaintiff and each member of the Class entered into the Opt-In Contract with Defendant covering the subject of overdraft transactions.  This contract was drafted by and is binding upon Defendant.

61.    In the Opt-In Contract, Defendant promised that ACU would assess overdraft fees only when there was not enough money in the account to cover the transaction.

62.    The contract incorporated by reference all applicable laws regarding its subject matter, including 12 C.F.R. § 1005.17, which mandates that all Opt-In Contracts for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the account agreement and accurately describe the overdraft fee practice, and bars financial institutions from assessing fees for non-recurring debit card and ATM transactions if they have not fully complied with that section's requirements.

63.    Plaintiff and Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Opt-In Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

64.    Defendant breached the express terms of the Opt-In Contract by, *inter alia*, assessing overdraft/NSF fees when there was money in the account to cover the transaction or transactions at issue.

65.    As a proximate result of Defendant's breach of the contract, Plaintiff and each member of the Class have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

### (Breach of the Account Agreement)

66.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

67.    Plaintiff and each of the Class members entered into the Account Agreement with Defendant covering the subject of overdraft transactions. This contract was drafted by and is binding upon Defendant.

68.    In the Account Agreement, Defendant promised that ACU would assess overdraft/NSF fees only when there were "not sufficient funds" in the account to pay for the transaction in question. Nowhere did the Account Agreement state that ACU would deduct pending debit card transactions for purposes of determining whether sufficient funds existed when assessing an overdraft/NSF fee.

69.    Plaintiff and Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

70.    Defendant breached the express terms of the Account Agreement by, *inter alia*, assessing overdraft fees when there were sufficient funds in the account to cover the transaction or transactions at issue.

71.    As a proximate result of Defendant's breach of the Account Agreement, Plaintiff and Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

72.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

73.    Plaintiff and each member of the Class entered into two contracts with Defendant covering the subject of overdraft/NSF transactions, which have been identified herein as the Opt-In Contract and Account Agreement. Both contracts were drafted by and are binding upon Defendant.

74.    In the contracts, Defendant promised that ACU would assess overdraft/NSF fees only when there was not enough money in the account to cover the transaction.

75.    The contracts incorporated by reference all applicable laws regarding their subject matter, including 12 C.F.R. § 1005.17, which mandates that the Opt-In Contract for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the account agreement and accurately describe the overdraft fee practice.

76.    Further, good faith is an element of every contract pertaining to the assessment of overdraft/NSF fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

77.    The material terms of the contracts also included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class members' rights and benefits under the contracts.

78.    Plaintiff and Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms

and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

79.     Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing fees when there was enough money in the account to cover the transaction, failing to provide an accurate description of its overdraft program in its Account Agreement contract, and failing to provide an accurate description of its overdraft/NSF program for non-recurring debit and ATM transactions in its Opt-In Contract.  In so doing, and in implementing its overdraft program for the purpose of increasing and maximizing overdraft/NSF fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiff and Class members of the full benefit of the contracts.

80.     As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

<u>**FOURTH CAUSE OF ACTION**</u>

**(Unjust Enrichment/Restitution)**

81.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

82.     As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft fees.

83.     The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practice.  (CFPB Bulletin 2013-07[3], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause

---

[3] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition"); CFPB Supervisory Highlights, Winter 2015, at p. 9 ("Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.").)

84.    Because Plaintiff and Class members paid the erroneous overdraft/NSF fees assessed by Defendant, Plaintiff and Class members have conferred a benefit on Defendant, albeit undeservingly. Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred. Should it be allowed to retain such funds, Defendant would be unjustly enriched. Therefore, Plaintiff and Class members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION

### (Money Had and Received)

85.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

86.    Defendant has obtained money from Plaintiff and Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

87.    As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and Class members, and thus, this money should be refunded to Plaintiff and Class members. Therefore, Plaintiff and Class members seek relief as set forth in the Prayer below.

## SIXTH CAUSE OF ACTION

### (Violation of Electronic Fund Transfers Act (Regulation E)

### C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 et seq.))

88.    The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

89.    By charging overdraft fees on ATM and nonrecurring transactions, ACU violated Regulation E (12 C.F.R. §§1005 *et seq.*), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq.*), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

90.    Specifically, the charges violated what is known as the "Opt In Rule" of Reg E. (12 C.F.R. §1005.17.) The Opt In Rule states: "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program  (*Id.*).  The description "shall be clear and readily understandable."  (12 C.F.R. §205.4(a)(1).)  To comply with the affirmative consent requirement, a financial institution must provide segregated writing of its overdraft practices that are accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

91.    The intent and purpose of this Opt-In Contract is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E (*Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).)

92.    ACU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions. ACU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction but ACU pays it anyway, when in fact ACU assesses overdraft fees when there is enough money in the account to pay for the transaction at issue.

93.    As a result of violating Regulation E's prohibition against assessing overdraft/NSF fees on ATM and non-recurring debit card transactions, ACU has harmed Plaintiff and the Class.

94.    Due to ACU's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C. § 1693m.

## SEVENTH CAUSE OF ACTION
### Violation of N.J.S.A. § 56:8-1 *et seq.*, the Consumer Fraud Act

95.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

96.    The New Jersey Consumer Fraud Act protects consumers from "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise…." N.J.S.A. § 56:8-2.

97.    Defendant entered into contracts with its consumer customers in which Defendant chose the language to bind the parties relating to the definition of "overdrafts" and the circumstances when Defendant was authorized to assess and collect overdraft fees from

customers' accounts. Defendant contracted with its customers so as to allow it to assess and collect overdraft fees only when the posted transaction resulted in a negative ledger or account balance.

98. Defendant has engaged in, and continues to engage in, unlawful conduct as a general business practice by breaching those contracts and misrepresenting its practices in the contracts, Specifically, contrary to what Defendant states is its practice in the contracts, Defendant uniformly and as a matter of policy assesses and collects overdraft fees on posted transactions with a positive account balance.

99. By engaging in the above-described practice and the actins, unconscionable commercial practices, and omissions herein alleged, Defendant has committed one or more unlawful acts in violation of the NJCFA.

100. Had Plaintiff and Class members known the actual facts or legal implications of those acts, they would have avoided the overdraft fees. Therefore, a causal relationship exists between Defendant's unlawful conduct and the ascertainable losses suffered by Plaintiff and the members of the Class.

101. By reason of the foregoing, Defendant has been improperly and unjustly enriched to the detriment of Plaintiff and the Class in an amount to be proven at trial. Plaintiff and the Class are entitled to have Defendant disgorge and restore to Plaintiff and the Class members all improperly taken monies as a result of their conduct as alleged herein.

102. Defendant's conduct caused Plaintiff and Class members to suffer an ascertainable loss. In addition to direct monetary losses, Plaintiff and Class members have suffered an ascertainable loss in that they received less than what was promised to them by Defendant in their account agreement and other disclosure forms. Therefore, Plaintiff and the Class are entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees and costs of suit.

103. As a result, Plaintiff and the Class have suffered an ascertainable loss of monies and pursuant to N.J.S.A. § 56:8-19 are entitled to threefold damages.

104.    Unless Defendant is enjoined from continuing to engage in this business practice, Plaintiff and the Class will continue to be injured by Defendant's wrongful actions and conduct. Therefore, Plaintiff and the Class are entitled to injunctive relief.

### PRAYER

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.    For treble damages under the NJCFA;

4.    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

5.    For an order enjoining the wrongful conduct alleged herein;

6.    For costs;

7.    For pre-judgment and post-judgment interest as provided by law;

8.    For attorneys' fees under the customer contracts, Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

9.    For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and Class members demand a trial by jury on all issues so triable.

Dated: July 10, 2018                    Respectfully submitted,


                                        /s/ Kevin P. Roddy
                                        Kevin P. Roddy
                                        kroddy@wilentz.com
                                        WILENTZ, GOLDMAN & SPITZER, P.A.
                                        90 Woodbridge Center Drive, Ste. 900
                                        Box 10
                                        Woodbridge, New Jersey 07095
                                        Telephone:    (732) 636-8000
                                        Facsimile:    (732) 726-6686


                                        Richard D. McCune, CA Bar No. 132124*
                                        rdm@mccunewright.com
                                        Jae (Eddie) K. Kim, CA Bar No. 236805*
                                        jkk@mccunewright.com
                                        McCUNE WRIGHT AREVALO LLP
                                        3281 East Guasti Road, Suite 100
                                        Ontario, California 91761
                                        Telephone: (909) 557-1250
                                        Facsimile: (909) 557-1275


                                        Taras Kick, CA Bar No. 143379*
                                        Taras@kicklawfirm.com
                                        Robert J. Dart CA Bar No. 264060*
                                        Robert@kicklawfirm.com
                                        THE KICK LAW FIRM, APC
                                        815 Moraga Drive
                                        Los Angeles, California 90049
                                        Telephone: (310) 395-2988
                                        Facsimile: (310) 395-2088


                                        *Pro Hac Vice applications to be submitted.

                                        Attorneys for Plaintiff Alicia M. Page
                                        and the Putative Class